**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

RONALD JENKINS a/k/a FRED JENKINS,

                                        Plaintiff

        - v -                                              Civ. No. 9:08-CV-0045
                                                                    (GLS/RFT)

BRIAN FISCHER, *New York State Dep't of Corr. Servs.*
*Commissioner, Individually and in his Official Capacity*;
LAWRENCE SEARS, *Former Superintendent, Franklin*
*Corr. Fac., Individually and in his Official Capacity*;
DUTELL,[1] *Individually and in his Official Capacity*,

                                        Defendants.


**APPEARANCES:**                                    **OF COUNSEL:**

RONALD JENKINS a/k/a FRED JENKINS
Plaintiff, *Pro Se*
*Last Known Address*:[2]
Bowery Mission Transitional Center
45-51 Ave. D
New York, New York 10009


HON. ANDREW M. CUOMO                          MEGAN M. BROWN, ESQ.
Attorney General of the State of New York     Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**

---

        [1] As evidenced by Defendants' submissions, the correct spelling of this Defendant's name is "Dutil" and the Court
will reference him accordingly.  *See, e.g.,* Dkt. No. 38, Defs.' Ans.

        [2] Though the Court's Docket reflects Mr. Jenkins's address as 2960 Frederick Douglas Blvd., New York, New York
10039, the Clerk's Office received a telephone call from Plaintiff wherein he provided a new address as indicated in the
caption.  Mr. Jenkins was directed to submit this information to the Court in writing, but, to date, he has failed to oblige.

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Ronald Jenkins, also known as Fred Jenkins, brings the instant civil rights action pursuant to 42 U.S.C. § 1983.  Dkt. Nos. 1, Compl.; 34, Am. Compl.  In his Amended Complaint, Jenkins claims that while incarcerated at Franklin Correctional Facility, he fell while attempting to descend from his assigned top bunk in his cell.  Am. Compl. at ¶ 14.  Jenkins claims to have suffered physical injury from the fall and attributes fault to the Defendants who allow a purportedly unsafe and inhuman condition to continue by their refusal to provide an alternate, safer means of ascending to and descending from the top bunk.  *See generally id.*  In this regard, Plaintiff asserts that Defendants failed to provide reasonably safe living conditions in violation of the Eighth Amendment.

Defendants Brian Fischer, Commissioner of the New York State Department of Correctional Services (DOCS), Lawrence Sears, Former-Superintendent of Franklin Correctional Facility, and Marc Dutil, Franklin Correction Officer, move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Dkt. No. 50.  Plaintiff opposes Defendants' Motion.  Dkt. Nos. 54-55.  For the reasons that follow, this Court recommends **granting** Defendants' Motion and **dismissing** this action in its entirety.

## I.  MATERIAL FACTS NOT IN DISPUTE[3]

At all times relevant to the matters complained of in the instant action, Plaintiff was in the custody of the New York State Department of Correctional Services (DOCS) and was housed at

---

[3] Most of the material facts in this case are not in dispute.  Instead, the parties disagree on the interpretation of these facts and whether a constitutional violation has occurred.  Where there is a general consensus regarding the material facts in this case, the Court will only cite to the Defendants' Statement of Material Facts.  We will make specific note of the few instances where the parties diverge in their respective versions of the facts.

Franklin Correctional Facility.[4]   Certain cubicles at Franklin contain double-bunk beds, along with two large lockers, two small lockers, and at least one chair.  Dkt. No. 50-3, Defs.' Statement of Material Facts (hereinafter "Defs.' 7.1 Statement") at ¶ 2.  The distance from the floor to the top bunk mattress is approximately 59″.  *Id*.  At least one of the large lockers is located adjacent to the bunk bed.  *Id*.  The height of the adjacent large locker is approximately 42″ and the height of the chair is approximately 18″.  *Id*.  Ladders were not provided and the Defendants assert that Franklin provided no "official" policy as to how inmates assigned to the top bunks would access their beds.  *Id*.  Nevertheless, they inform the Court that an inmate seeking to descend from the top bunk typically climbs from the top bunk bed to the adjacent large locker (approximately 17″ away) and then, from the locker, climbs onto the seat of the chair (approximately 24″ away).  *Id*.  To ascend to the top bunk, the process is reversed.

When an inmate is first received into Franklin, he is evaluated by the medical staff as to whether he qualifies for a medical excuse permit, which would enable him to be housed in the bottom bunk only.  *Id*. at ¶¶ 8 & 15.  Also, certain qualified inmates can request low bunk placements, including inmates who are over sixty years of age, and/or who weigh over 300 pounds, and/or who believe a medical condition or physical disability precludes placement in the top bunk.  *Id*. at ¶ 3.  There appears to be an unspoken rule of seniority when it comes to bunk assignments.  Such seniority is measured by the date the inmate started housing in a particular dorm.  *Id*. at ¶ 10.  Those who have the least seniority in the dorm and are without bottom bunk passes are assigned to a top bunk and systematically assigned to a bottom bunk once it becomes available.  *Id*. at ¶¶ 11-12.  It could take between two to three months to be assigned to a bottom bunk.  *Id* at ¶ 12.

In July 2007, Plaintiff was incarcerated in Franklin's B2 Dormitory.  *Id*. at ¶ 13.  At that time,

---

[4] *But see infra* Part II.B (noting the Plaintiff's release from DOCS's custody during the pendency of this action).

he was assigned to a top bunk bed. *Id*. at ¶ 14.  Upon arrival at Franklin, Plaintiff asserts he received instructions from Dutil regarding the process of accessing his top bunk; Dutil asserts that, while he has no independent recollection of such conversation, it was not his habit to inform inmates on how to access the top bunk.  *Compare* Dkt. No. 50-5, Megan M. Brown, Esq., Affirm., dated Nov. 13, 2009, Ex. A, Ronald Jenkins Dep., dated June 26, 2009, at p. 12, *with* Dkt. No. 50-10, Marc Dutil Decl., dated Nov. 5, 2009, at ¶ 8.  Nevertheless, during his ten years assigned to the B2 Dorm, Dutil has observed inmates climbing up to and down from the top bunk using the process described above or some variation thereto.  Dutil Decl. at ¶¶ 9-10.

Prior to July 13, 2007, Jenkins did not request a lower bunk permit nor did he grieve his top bunk assignment, however, he asserts that he asked or complained to Officer Dutil about when he would be transferred to a lower bunk.  Jenkins Dep. at p. 20 ("It was just a matter of saying, when am I going to get mine, and he said, you just have to wait until it's your turn on the list, and I basically left it alone at that."); Defs.' 7.1 Statement at ¶¶ 14-15.  Also prior to that date, Jenkins maneuvered up to and from his assigned top bunk between four and seven times each day for weeks without incident, with the exception of one instance when he almost slipped but suffered no injury.  Defs.' 7.1 Statement at ¶¶ 16-17.  However, on the evening of July 13, 2007, while climbing down from his top bunk, Plaintiff slipped and fell.  *Id*. at ¶ 18.  During his examination before trial, Jenkins testified that the accident occurred in the evening after the lights were out in the dorm.  Jenkins Dep. at pp. 29-30.  He claims he woke up and attempted to crawl out of bed to use the bathroom.  *Id*. at p. 30.  After safely securing himself onto the locker located at the foot of his bed, he attempted to climb down to the chair when it slid out from under him, causing him to fall and hit the back of his head and part of his back on the locker.  *Id*. at pp. 30-31.  Upon falling to the ground, he claims to have been knocked unconscious.  *Id*.

at p. 31.  Jenkins further described the injuries he sustained, both physically and mentally, some of which last to this day, including, for example, migraines, dizzy spells, and fear of heights.  *Id*. at pp. 31-38; *see also* Dkt. No. 34, Am. Compl. at ¶¶ 18-21.  Approximately two days after the accident, Jenkins was assigned to the lower bunk, allegedly because it was his "turn."  Jenkins Dep. at p. 42.

## II.  DISCUSSION

### A.  Standard of Review

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . .  the moving party is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere

conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

### B.  Plaintiff's Release From Prison

Upon information and belief, Plaintiff was released from DOCS's custody on or about March 2, 2009. *See* Ct. Attach. 1, NY DOCS Inmate Population Information Search for Jenkins, Ronald, DIN 07-A-1207, *available at* http://nysdocslookup.docs.state.ny.us (last visited July 30, 2010). This release date coincides with Plaintiff's notification to the Court in March 2009 of a change in his address. Dkt. No. 26. Though not raised by either party, Plaintiff's release from DOCS's custody to the New York

State Division of Parole impacts some of his claims for relief.

Plaintiff's release to parole means that he is no longer under the supervision of DOCS, but rather of the New York State Parole authorities.  *See* N.Y. PENAL LAW § 70.40(1)(b).  Therefore, to the extent Jenkins seeks injunctive relief, such as the installation of ladders and/or a change in DOCS's policy, it must be dismissed as moot.  *Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000) ("Because [plaintiff] is no longer incarcerated and under the supervision of any of the named defendants, his requests for injunctive relief are dismissed as moot." (citations omitted)) (cited in *Morales v. Woods*, 2008 WL 686801, at *1 n.1 (N.D.N.Y. Mar. 10, 2008)); *see also Collins v. Goord*, 2009 WL 1796550, at *3 (W.D.N.Y. June 24, 2009) (citing cases for the proposition that a plaintiff's release from DOCS's custody renders his claims for injunctive and declaratory relief moot).  Accordingly, we recommend **dismissal** of Plaintiff's claims for injunctive and declaratory relief.

In that same vein, with the removal of claims for injunctive relief, we note that the Eleventh Amendment further limits the scope of the claims asserted herein.  Although by its terms, the Eleventh Amendment bars suits by citizens of one state against another state, the Supreme Court has held that such Amendment similarly bars suits against a state by its own citizens.  *Hans v. Louisiana*, 134 U.S. 1 (1890); U.S. CONST. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.").  "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.'"  *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 447-48 (2d Cir. 1999) (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)).

Thus, the sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. at 98; *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.* 915 F. Supp. 525, 539 (N.D.N.Y. 1995) (citation omitted); *see also Mathie v. Fries*, 121 F.3d 808, 818 (2d Cir. 1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer . . . .").

Usually, this immunity does not extend to injunctive or declaratory relief, however, because we have already recommended all injunctive relief be **dismissed as moot**, we similarly recommend that Plaintiff's claims against all Defendants in their official capacities should be **dismissed**. *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir. 1993) (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.*, 915 F. Supp. at 540.

### C.  Safety Conditions in Double-Bunked Cells

Turning next to the merits of Plaintiff's Eighth Amendment claim, we start with the proposition that double-celling, even in maximum security prisons, does not alone constitute cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 339 (1981). Thus, to the extent Plaintiff's complains that the small living quarters housing two inmates was a violation of the Constitution, such claim should be **dismissed**. Nevertheless, it is clearly established that "while the Constitution 'does not mandate comfortable prisons,' prisoners may not be denied 'the minimum civilized measure of life's necessities.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Rhodes v. Chapman*, 452 U.S. at 347 and 349). In this regard, prisoners may not be deprived of their "basic human needs – e.g.,

food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) for the proposition that "[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."). Simply put, the Constitution draws a line between conditions that are harsh, and conditions that are "cruel and unusual" within the meaning of the Eighth Amendment. "To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. at 347.

At issue in this case is whether Plaintiff was deprived of reasonable safety when he was assigned to a top bunk without being provided a "safe" mechanism by which to traverse to and from that top bunk. Defendants counter, as one basis in support of their request for summary judgment, that they are entitled to qualified immunity. The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz*, 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court was to decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. at 201-02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier*. *See Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs

may be addressed, though the sequence of review may remain appropriate or beneficial.  *Id*. at 818.

In light of the direction provided in *Pearson*, we opt to start with the inquiry as to whether it is clearly established that ladderless bunks in double-bunked cells objectively pose a substantial risk of serious harm that society would consider so "grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993). To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] support[] its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *see also Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999).  Furthermore, a party is entitled to summary judgment on qualified immunity grounds if the court finds that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right."  *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (citations omitted).

In researching this matter, we were surprised at the dearth of cases within the Second Circuit dealing with the issue of ladderless bunks, whereas a plethora of district court decisions across the nation were unearthed that universally espouse the view that a  ladderless bunk is <u>not</u> a sufficiently unsafe living condition warranting Eighth Amendment protection.  *See Shepherd v. Borg*, 65 F.3d 175, 1995 WL 499517, at *1 (9th Cir. Aug. 22, 1995) (unpublished decision) (determining, on facts similar to the case before this Court, that the plaintiff failed to offer evidence in opposition to summary

judgment "that the [ladderless] bunk bed design posed an excessive risk to inmate safety"); *White v. Rader*, 2010 WL 1744652, at *3 (M.D. La. Mar. 29, 2010) (citing cases for the proposition that ladderless bunks did not violate the Eighth Amendment, nor did plaintiff show that defendants were aware of and ignored any imminent danger); *Sayles v. Anderson*, 2010 WL 234909, at *3 (D.S.C. Jan. 19, 2010) (noting that a ladderless bunk, at best, presents a claim of negligence, which is not actionable under § 1983, and the failure to provide ladders or steps was not a sufficiently serious denial of life's necessities, especially where the pre-trial detainee was offered the choice of sleeping on the floor); *McCray v. Sherry*, 2009 WL 2477299, at *3-4 (W.D. Mich. Aug. 11, 2009) (holding that ladderless bunks present nothing more than negligence, which does not amount to an Eighth Amendment violation); *Jones v. La. Dep't of Pub. Safety and Corr.*, 2009 WL 1310940, at *2 (W.D. La. May 11, 2009) (holding that the use of ladderless bunks does not violate the Eighth Amendment); *Connolly v. County of Suffolk*, 533 F. Supp. 2d 236, 241 (D. Mass. 2008) (same); *Armstrong v. Terrebonne Parish Sheriff*, 2006 WL 1968887, at *6 (E.D. La. June 6, 2006) (dismissing case pursuant to 28 U.S.C. § 1915(e)(2) because the use of a swivel chair, while "imperfect and inconvenient," is a reasonable means to access top bunk and is not a severe deprivation of constitutional proportion; the court further determined that the inmate is charged with reasonable care for his own safety); *Wilson v. State*, 2002 WL 31499736, at *1 (W.D. Va. May 6, 2002) (affirming magistrate judge's ruling that a ladderless bunk did not present a "specific risk of serious harm"); *Ponson v. Filbert*, 2001 WL 34786009, at *3 (D. Md. Mar. 21, 2001) (noting no Eighth Amendment violation for ladderless bunks).

Yet, in reviewing cases within our own jurisdiction, which are bereft of any controlling precedent on point, we note a trend in allowing cases alleging unsafe prison conditions of this nature to proceed to trial. For example, in *Baumann v. Walsh*, 36 F. Supp. 2d 508 (N.D.N.Y. 1999), the

plaintiff claimed that he was subjected to an unsafe working condition in prison whereby he was denied a ladder and instead had to climb along the shelves and stand on boxes in order to retrieve material off the top storage shelves.  Ruling on then-Magistrate Judge Gary L. Sharpe's report-recommendation and order, District Judge Frederick J. Scullin, Jr., found that the working conditions were inherently unsafe, dangerous, and posed a substantial risk of serious harm.  36 F. Supp. 2d at 513-14.  Judge Scullin's inquiry focused on the inmate's *exposure* to harm, and not whether serious harm actually occurred.[5] *Id.* at 514 (citing *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y.), *aff'd* 1998 WL 636985 (2d Cir. July 21, 1998) (unpublished decision), for the proposition that a prisoner need not suffer serious physical injury to establish a claim for unsafe prison conditions).[6]

While we did not find cases more directly on point within the Northern District, other cases throughout the Second Circuit are worth noting.  First, in *Rivera v. McKenna*, 2004 WL 231396 (D. Conn. Feb. 5, 2004), the district judge granted defendants' motion to dismiss plaintiff's claim that the failure to provide ladders for access to the top bunk did not present a claim beyond mere negligence. 2004 WL 231396, at *2.  In ruling on the merits of such a claim, the court focused on whether the warden had been made aware of the unsafe condition prior to the inmate's fall and found that, at most,

---

[5] The *Baumann* matter went to trial wherein a jury found plaintiff had not stated a cause of action against the defendants.  *Baumann v. Walsh*, Civ. No. 9:95-CV-1458, Dkt. Nos. 149, Minute Entry, dated Oct. 2, 2002, & Judgment for Defs., dated Oct. 2, 2002.

[6] Although not specifically on point, several other rulings from this District found questions of fact as to unsafe prison conditions.  *See Monroe v. Mullen*, 2007 WL 2874435 (N.D.N.Y. Sept. 27, 2007) (Kahn, D.J.; Peebles, M.J.) (finding issues of fact existed on both objective and subjective prongs wherein the plaintiff complained of an unsafe prison condition regarding the laundry van he was allegedly forced to ride despite the fact that it had inadequate seating capacity and non-working rear door latches); *Paulson v. Costello*, 2007 WL 2903952 (N.D.N.Y. Oct. 2, 2007) (Peebles, M.J.) (recommending dismissal on exhaustion grounds, but suggesting, in light of *Baumann v. Walsh*, 36 F. Supp. 2d at 513-14 and *Gomez v. Warden of the Otisville Corr. Facility*, 2000 WL 1480478, at *5 (S.D.N.Y. Sept. 29, 2000), that plaintiff's factual allegations regarding the unsafe condition created by the slippery, non-skid shower floors in the prison were sufficient to transcend the case from mere negligence to support an Eighth Amendment claim); *Johnson v. Bernard*, 2006 WL 1843292 (N.D.N.Y. June 29, 2006) (Scullin, D.J.; Peebles, M.J.) (determining that an issue of fact existed as to whether an Eighth Amendment violation occurred as a result of the deterioration and bubbling of the gym floor, of which the defendants were made aware and had sought new funding to replace, but failed to preclude access to the gym in the interim).

his actions constituted negligence, but were not deemed unconstitutional.  *Id.*

The second case of note hails from the Southern District of New York: *Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2006).  In *Jones*, several inmates challenged certain practices at maximum security prisons, including unsafe conditions within the cell, such as the lack of a safe means of getting on and off the top bunk bed.  Because plaintiffs made no argument about the design of the beds being unsafe, the court dismissed such claims.  435 F. Supp. 2d at 245.

Finally, we take note of two cases from the Eastern District of New York which present facts more analogous to our case.  *See Harris v. N.C.P. Dep't, Detective Div.*, 2007 WL 1540232 (E.D.N.Y. May 24, 2007) & *Armstrong v. Breslin*, 2006 WL 436009 (E.D.N.Y. Feb. 22, 2006).  Both cases began on the same trajectory with both Harris and Armstrong complaining about the lack of ladders or an alternate safe method by which to access their assigned top bunks in their cells.[7]  And, both plaintiffs withstood initial challenges as to whether a claim was stated.[8]  The *Armstrong* court was confronted by a more complete record and the complaint was defeated at the summary judgment stage.  The court ruled that plaintiff failed to present sufficient evidence to show that using chairs and lockers as climbing mechanisms created a dangerous condition under the objective prong; plaintiff also failed to establish sufficient culpability under the subjective prong.  *See* Ct. Attach. 2, *Armstrong v. Breslin*, E.D.N.Y. Civ. No. 1:05-CV-2876, Dkt. No. 58, Opinion and Order, dated Mar. 9, 2007, at pp. 7-8.[9]

As evidenced by the conspicuous divergence of opinions, we simply lack any clear guidance

---

[7] Because Harris was a pre-trial detainee, he asserted that his rights under the Fourteenth Amendment were violated, but the court employed the same substantive Eighth Amendment analysis in determining his claim.

[8] For Harris, the inquiry was focused on his ability to amend; Armstrong, on the other hand, withstood a motion to dismiss.

[9] Resolution of the *Harris* case appears to have been achieved through court aided settlement after service of the amended complaint.

as to whether the absence of ladders in double-bunked cells violates the Eighth Amendment.  In this regard, while it is clearly established that prisoners have the right to detention in reasonably safe prisons, it is not clearly established that the absence of ladders in double-bunked cells violated such rights nor that a reasonable officer would believe that his actions violate clearly established constitutional rights.  Therefore, Defendants are entitled to qualified immunity.

Nevertheless, for the benefit of the reviewing court, we undertake a review of the merits of the Eighth Amendment claim.

Plaintiff remains steadfast that DOCS's policy of not providing safe means to access the top bunk violated his Eighth Amendment right to be housed in reasonably safe living conditions.  Though Defendants acknowledge that most inmates utilize the furniture in the room as a means of traversing to and from the top bunk, they claim, seemingly in defense, that they had no "official" policy as to how an "able bodied" inmate would access the top bunk.  *See* Dkt. No. 50-7, Stephen Brown Decl., dated Nov. 13, 2009, at ¶ 4.  We can easily refute this defense.  The Court has received from Plaintiff and Defendants a variety of decisions rendered by the Central Office Review Committee (CORC) in response to multiple appeals of inmate grievances from all different correctional facilities dealing with complaints of the ladderless bunks.  Dkt. No. 50-5 at p. 62; Dkt. No. 54-2.  CORC's response to each appeal, no matter the facility at issue, state, in sum and substance, the same thing: "Chairs and lockers positioned in the cube establishes a safe way to climb to the top bunk for most persons."  *See, e.g.*, Dkt. No. 54-2 at p. 5.  Sometimes there is also a reference to the fact that "[t]here is no provision in departmental policy requiring the installation of ladders for use by double bunked inmates."  *Id*. at p. 8.  These CORC decisions have the same force and effect as DOCS Directives, thus, we find there is indeed an official policy straight from DOCS as to how "able bodied" inmates are to maneuver to and

from the top bunk.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(d)(2)(ii) ("[T]he CORC functions on

behalf of the commissioner and under his authority.  CORC decisions have the effect of directives.");

*see also Fluellen v. Goord*, 2007 WL 4560597, at *2 (W.D.N.Y. Mar. 12, 2007); *Amaker v. Goord*,

2007 WL 4560596, at *3 (W.D.N.Y. Mar. 9, 2007).  We are left, therefore, to determine whether

DOCS's policy created an unconstitutionally unsafe living condition.

As a general rule, if it is determined that a prison regulation impinges an inmate's constitutional

rights, the regulation will nevertheless be upheld if it is "reasonably related to valid penological

interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).[10]  In determining whether a particular regulation

withstands scrutiny under that test, the Supreme Court instructs the courts to consider four factors: (1)

whether the regulation or policy has a "valid, rational connection" to a "legitimate governmental

interest;" (2) whether alternative means are available to inmates to exercise the asserted right; (3) what

impact an "accommodation of the asserted right [would] have on guards and inmates, and on the

allocation of prison resources generally;" and (4) whether there are "ready alternatives" to the

regulation.  *Id*. at 89-90.  This "standard is necessary if prison administrators . . ., and not the courts,

[are] to make the difficult judgments concerning institutional operations." *Id*. (internal quotation marks

and citation omitted) (alterations in original).

We first determine whether the ladderless bunk is an insufficiently unsafe living condition such

that it violates the Eighth Amendment.  To set forth an Eighth Amendment claim based on unsafe living

conditions, a plaintiff must demonstrate that he is, objectively, incarcerated under conditions posing

a substantial risk of serious harm and, that the prison officials, subjectively, possessed the sufficient

---

[10] While the *Turner* case concerns the First Amendment, its analysis has been applied to other inmates' rights cases. *See Colman v. Vasquez*, 142 F. Supp. 2d 226, 231-32 (D. Conn. 2001) (citing cases and applying the *Turner* test in assessing whether a prison policy violated a prisoner's Fourth and Eighth Amendment rights).

culpable intent of deliberate indifference.  *See generally Helling v. McKinney*, 509 U.S. 25 (1993);

*Hayes v. New York City Dep't of Corr.*, 84 F.3d at 620.  In assessing whether a deprivation is

objectively sufficiently serious, a court must assess not only the seriousness and likelihood of potential

harm but also "whether society considers the risk that the prisoner complains of to be so grave that it

violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v.*

*McKinney*, 509 U.S. at 36 (emphasis in original).  In this regard, the objective assessment requires more

than a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that

such injury" would occur.  *Id*.  And, the prisoner need not wait until actual injury occurs to challenge

an unsafe condition, as long as the prison condition is sure to cause or very likely to cause needless

suffering.  *Id*. at 33.  With regard to the subjective element, "a prison official has a sufficient culpable

intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that

risk by failing to take reasonable measures to abate the harm."  *Hayes v. New York City Dep't of Corr.*,

84 F.3d at 620.  The prison official "must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v.*

*Brennan*, 511 U.S. at 837.  Mere negligence will not suffice.

Defendants maintain that the lack of ladders in the cells does not pose a dangerous condition

of confinement and have submitted statistical data as support.  According to James Lyons, Program

Planning, Research and Evaluation Specialist for DOCS, there have been a total of 7,248 male inmates

assigned to a top bunk at Franklin for the time period of 2004 through 2008.  Dkt. No. 50-6, James A.

Lyons Decl., dated Nov. 6, 2009, at ¶ 6.  Mr. Lyons further explains that

> [d]uring that period, there have been 499,164 individual occasions where one of those
> inmates has been in a top bunk bed (every time one inmate is in a top bunk bed for one
> day it is counted as an occasion).  At the very minimum, an inmate would climb up or
> down from a top bunk at least twice a day (i.e., once in the morning and once in the

evening).  Consequently, there have been at least 998,308 individual instances when inmates have climbed up to or down from a top bunk.  With inmates permitted to return to their housing units during non-program hours and required to return to their housing units during mandatory inmate counts, the number is probably a multiple of the 998,308 minimum figure.  While at the very minimum there have been 998,308 instances when inmates at Franklin Correctional Facility have climbed up to or down from a top bunk during the period 2004 through 2008, a review of all Inmate Injury Reports for the same period reveals that in only 12 of these instances had an inmate at Franklin reported having been injured in the process.

*Id*. at ¶¶ 6-7.

While this statistical information seems on the surface to represent a slim risk-of-injury, we note that such information is limited to Franklin and does not represent the ratio of injuries that may have been sustained throughout all DOCS facilities.  And, the injury statistics may not account for all falling incidents, but rather, only those reported.  To be clear, the policy under scrutiny is not relegated to Franklin, but applies, as far as we can tell, to all DOCS facilities that house double-bunked cells.  Furthermore, while these statistics may aid in determining whether, objectively, the condition is sufficiently serious, the Supreme Court cautions that mere statistics are not enough.  *Helling v. McKinney*, 509 U.S. at 36.  It is conceivable that this analysis provides some insight as to whether they possessed the requisite subjective intent, but, in terms of assessing the objective dangerousness of the condition, the statistics fall short.  *Id.*

In his opposition papers, Plaintiff relies heavily on Judge Scullin's decision in *Baumann v. Walsh*, 36 F. Supp. 2d 508 (N.D.N.Y. 1999) for the proposition that the failure to provide ladders and instead allow inmates to climb up and down dangerous heights created a "substantial risk of serious harm."  Dkt. No. 54 at ¶ 3.  He further debunks Defendants' arguments and urges the Court to focus not on whether an injury actually occurred, but rather the dangerousness of the unsafe condition and the potential for grave injury.  *Id.* at ¶¶ 17-19 (analogizing Defendants' low-injury argument to the faulty premise that people who perform a high wire act at the circus often perform such task without

incident and therefore are engaging in a safe act). Plaintiff also goes to great length in describing the furniture in the cell, focusing on the fact that such pieces were not built with the intention that an adult bestride it; he has even provided the Court with the brochure provided by the manufacturer of the cell furniture, which includes information on height, length, and width, and assembly instructions. *Id*. at ¶¶ 39, 41, 68, 72, & Ex. G. Perhaps most compelling is his description of the cell chairs, which he asserts have four metal legs with circular gliders affixed to the bottom of each leg to avoid scratching the floor. These gliders, according to Plaintiff, make the chair more susceptible to gliding and thus it is easy to envision how the chair may have slipped out from under him on the night he fell. *Id*. at ¶ 39.

Plaintiff's well-supported papers provide some compelling arguments in support of finding an issue of fact with regard to the inherent dangerousness of the conditions in his cell, especially when viewed in light of the analyses in *Helling* and *Baumann*, which focus on the exposure to a risk of harm. If, for the moment, we were to find that the condition in the double-bunked cell constituted an unconstitutionally unsafe condition, our inquiry would necessarily proceed to determine whether the Defendants knew the inmate faced a substantial risk of serious harm and disregarded the risks by failing to take reasonable measures. An issue of fact on this prong could be gleaned from the papers provided. On the one hand, Plaintiff provides numerous grievances from inmates from different correctional facilities complaining about various injuries they sustained when they fell from their beds while attempting to climb up to or down from the beds in the manner proscribed by DOCS. Dkt. No. 54-2, Ex. A. There can be no doubt that these grievances represent but a sampling of the actual incidents. Defendants, on the other hand, provide statistics to show that at Franklin, in light of the number of injuries reported and the number of times an inmate will climb up to and down from the top bunk on a daily basis, the risk of injury is minimal. As with the objective prong, we find these statistics to be

inadequate.  If anything, the statistics show that the Defendants were aware that a risk of harm occurred, but given the perceived paucity of reported instances of injury, it was a risk they were willing to take. However, if indeed the condition of confinement places an inmate in unreasonably unsafe living condition that could subject him to serious harm, a statistical analysis of the risk of harm to an inmate that DOCS is willing to endure would suggest that the subjective prong is either met, or at least an issue of fact is established.

Having found that arguably an Eighth Amendment claim could be established, we move on to determine whether the regulation at issue survives the *Turner* test.

Defendants explain that their policy is in furtherance of security concerns.  According to Stephen Brown, Deputy Superintendent of Security at Franklin, providing ladders in the double-bunked cells would pose security concerns in medium or maximum security prisons. Dkt. No. 50-7, Brown Decl. at ¶ 8.  Brown opines that the ladder could hinder visibility into the bottom bunk, and visibility could be blocked altogether if clothing or towels were hung on the ladder rungs.  *Id*.  Brown further states that a ladder could "interfere with a forced cell or cubicle extraction by making it more difficult for staff to secure noncompliant and potentially violent inmates who position themselves behind the ladder or clings to the ladder rungs."  *Id*.  And, lastly, Brown states that a ladder would serve as an "additional hard surface that inmates or staff could be injured on in the course of an altercation."  *Id*.

Security concerns, such as those cited by Mr. Brown, are taken very seriously by this Court. Indeed, the Supreme Court directs that "[p]rison administrators . . . be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  Such deference applies to

"prophylactic or preventive measures intended to reduce the incidence of . . . breaches of prison discipline." *Id*. at 322. The Defendants' security concerns certainly have a valid, rational connection to their policy of having no ladders in the cell. Indeed, the impact and potential disruption, not to mention overwhelming costs associated with providing ladders in each double-bunked cell across the entire state, more than outweigh the potential, and possibly minimal, infringement on prisoners' safety. And, while the statistical information cited above does not, in our estimation, establish the overall reasonable safety for the Eighth Amendment analysis, it does lend some credence to the Defendants' having weighed the pros and cons of such policy, ultimately favoring institutional security over the perceived minimal risk of harm. Where, as here, a state penal system has made a determination regarding institutional safety, the doctrine of separation of powers dictate judicial restraint and deference. *Duamutef v. Hollins*, 297 F.3d 108, 112 (2d Cir. 2002) (citing cases).

We accordingly find that, to the extent DOCS's policy of precluding ladders in double-bunked cells encroaches on a prisoner's right to reasonable safety, such policy is valid for its legitimate and rational relation to a non-penalogical reason of institutional security. Therefore, we recommend **granting** Defendants' Motion for Summary Judgment and dismissing this case in its entirety.

**WHEREFORE**, based on the foregoing, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 50) be **GRANTED** and this action be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

Dated:   September 8, 2010
          Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge